Cite as 2021 Ark. App. 404

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV–21–155

|  |  |
|---|---|
| DAWN GAMBLE | **Opinion Delivered** October 20, 2021 |
| APPELLANT | |
| V. | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72JV-19-678] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE STACEY ZIMMERMAN, JUDGE |
| APPELLEES | |
|  | AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Dawn Gamble appeals the Washington County Circuit Court's order terminating her parental rights to her four children, IM (DOB 9-14-15), MM (DOB 11-11-16), RM (DOB 1-20-18), and GM (DOB 12-26-18).[1]  Appellant does not challenge the statutory grounds for termination but rather argues that it was not in the children's best interest for her parental rights to be terminated since there was a lesser restrictive option to termination and because she did not pose a risk of harm to her children.[2]  We affirm.

---

[1]IM and MM are females; RM and GM are males.  The circuit court also terminated the parental rights of the children's father, Dakota Mobley, but he is not a party to this appeal.

[2]Because appellant does not challenge the statutory grounds for termination of her parental rights, she abandons any challenge to those findings on appeal.  *See Cole v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 481, 611 S.W.3d 218.

The Arkansas Department of Human Services (DHS) had been involved with appellant's family on and off for several years after three children were born with drugs in their systems.[3]  At the time of the children's removal, on August 2, 2019, the protective-services case opened after GM's birth was still open, and the family was living at Woodspring Suites.  DHS provided services to the family during this time, including drug screens, home visits, family assessment, day-care referrals, housing referrals, assistance making medical appointments, and cleaning supplies.  On August 1, while conducting a visit, DHS observed that the hotel room was filthy and in disarray; RM's neck had been injured by a neighbor's dog's collar and was red; there was rotten food in the refrigerator; the room was swarming with flies due to a pile of trash and dirty clothes containing feces;  the bathroom smelled of feces and urine; the diapers and formula were outside in the van; MM had at least three teeth that were rotted to the gumline; and there were two dogs in the room.[4]  Both parents refused drug screens, stating that they would test positive for THC since they had tested positive the week before.  Mobley, irritated by DHS's presence, ordered DHS out of the room.  DHS returned the next day with the police due to the hostility experienced on August 1.  The room was still in disarray, and at least one of the dogs had ticks.  DHS explained that it did not believe the parents' explanation about RM's neck injury and that there were concerns about inadequate supervision.  GM had on a soiled diaper and MM's

_____

[3]MM was born with drugs in her system, and a protective-services case was open from December 21, 2016, to July 18, 2017.  The case closed after DHS was unable to locate the family.  Another protective-services case opened after RM was born with drugs in his system.  It closed after less than three months for the same reason.  GM was also born with drugs in his system, and a protective-services case was opened on February 10, 2019.

[4]These are just some of the observations made by DHS; there were more.

shorts were soaked with urine. Appellant yelled and tried to prevent the children's removal to the extent that she had to be arrested and removed from the scene.

DHS filed a petition for dependency-neglect on August 6, outlining the above history in an attached affidavit. The court entered an ex parte order for emergency custody the same day. A probable-cause hearing took place on August 9,[5] and in the August 12 order, the court found that an emergency existed making it necessary for DHS to remove the children from the parents' custody and that those conditions still existed. Appellant was granted supervised visits with the children and ordered to do certain things before custody could be restored to her. Appellant was ordered to refrain from using illegal drugs; to submit to random weekly drug screens; to obtain and maintain employment and stable housing adequate for the children; to maintain a clean, safe home; and to demonstrate the ability to protect the children and keep them safe.

The children were adjudicated dependent-neglected due to parental unfitness and neglect in an order filed on September 20.[6] The circuit court specifically found that the children were neglected because: (1) the parents did not have a clean, safe, and stable home for the children at the time of removal, and (2) the children were so badly neglected that MM suffered from extensive dental issues (rotted teeth). The goal of the case was reunification with a fit parent. However, the circuit court stated that the parents needed to

---

[5]The order incorrectly states July 9.

[6]The adjudication hearing took place over two days. Appellant was granted a continuance at the August 30 hearing because her attorney had a medical emergency, and appellant had not been able to meet with her. The September 3 adjudication did not make any adjudication of the children.

work on three major issues to get the children back: (1) be employed, (2) have a home, and (3) refrain from illegal drug use.

A review hearing took place on January 31, 2020. In the order entered the same day, the circuit court found that appellant had complied with some of the court's orders but that she did not have a stable home or a driver's license. It also found that DHS had made reasonable efforts to achieve the goal of reunification.

The permanency-planning hearing (PPH) took place on July 17. In the August 14 order, the circuit court found that the parents were not complying with the established case plans and orders and were not making significant, measurable progress toward achieving reunification. The circuit court changed the case's goal to adoption and termination of parental rights. The circuit court noted that appellant still did not have stability and had not maintained stable employment. It also stated that appellant had not demonstrated that she could safely and appropriately care for the children and keep them safe. Appellant was still allowed visitation with the children, but the circuit court noted that if she had a man around the children, the visits would stop. Additional findings of the court stated that appellant had not once been in full compliance, and that although appellant was making progress in therapy, her actions did not reflect the progress. The circuit court also noted that it was incorporating the closing statements of DHS and the ad litem as its own.

DHS filed a petition for the termination of parental rights (TPR) on October 6, alleging three grounds for the termination of appellant's parental rights to her four children: (1) twelve-month failure to remedy, (2) subsequent other factors, and (3) aggravated circumstances in that there is little likelihood for successful reunification.

4

The termination hearing took place on December 9. Christine Zini, of DHS, testified that she is the family caseworker and that the children were removed on August 2, 2019, due to their living situation, poor supervision, and MM's dental health (medical neglect). She said that GM was on special formula but that appellant did not have him on it. She stated that the protective-services cases on appellant's children began in 2016. Zini testified that the children were doing better since being removed from their parents' custody. She said that the children are currently undergoing or will undergo several types of needed therapies. She stated that the children are placed with their paternal grandmother, who is interested in adopting them. She opined that the children are adoptable. She stated that TPR is in the children's best interest because they need consistency, they are receiving needed therapies, and they are doing well under their grandmother's care. She testified that the children were at risk of harm if returned to their parents because there was a lack of a stable home big enough to accommodate the children, and she was unsure whether day care or therapies would be continued if the children were returned. She said that although services had been provided to appellant, appellant was still unable to keep the children safe. She stated that appellant could not provide a safe, stable home for the children and could not provide transportation. Zini stated that appellant last showed up for a drug screen on October 31, and that appellant was positive for THC at that time. She said that continued services would not result in successful reunification with appellant and stated that DHS was recommending TPR.

On cross-examination, Zini testified that appellant consistently tested positive for THC on her drug screens. She said that appellant told her she was going to obtain a medical-

5

marijuana card but that DHS had not been presented with one. She stated that appellant's visits with the children had generally gone well but that recently MM and IM have been angry and having issues following visits because they realize that appellant is no longer with Mobley.

On cross-examination by the ad litem, Zini stated that she had not been to appellant's new home because appellant had only recently moved there. She said that prior to moving there, appellant and her new husband, Aaron Johnson, were living with Johnson's step-grandfather and taking care of him. Zini testified that, before that, appellant and Johnson lived at a hotel. She stated that the children were removed from an inappropriate hotel room and that the conditions that caused removal had not been remedied. She said that appellant currently works about thirty-five hours every two weeks at McDonald's and does not make enough to support four children. She stated that appellant has not been consistently employed. She also stated that appellant had not made enough progress to have unsupervised visits, expanded visits, or trial home placements. She testified that appellant had not been in full compliance with the case plan and that there were not any services DHS could provide to appellant to help with reunification.

Appellant testified that she and Johnson currently live in a one-bedroom "tiny house" that they are renting. She stated that she has worked for McDonald's for about a month and that her first paycheck was $325 for two weeks. She said that she came in for drug screens until she moved out of Johnson's step-grandfather's apartment and had transportation issues. She also said that some of the drug screens conflicted with her work schedule. Appellant stated that she would be able to address the children's special needs and

take them to the doctor if they were returned to her. She testified that she currently has access to her landlord's Chevy Sonic while the vehicle she purchased from him is in the shop getting fixed.

On cross-examination, appellant stated that the tiny home is more like a brown wooden shed that has been turned into a one-bedroom home. She said that at some point, a wall will be removed, and another shed will be attached to make the home two bedrooms. She testified that she anticipated the home being made big enough for the children sometime in the future, or they will just rent an apartment large enough when "taxes come in." She testified that she is currently trying to get a job at Whataburger because she "needs something better than [a little over $300] to cover [her] rent and cover the expenses and taking care of the children and everything else." She said that she is going to see about applying for food stamps. She stated that she is still in counseling and plans to continue with it regardless of what happens with the TPR. She said that Johnson has also attended some sessions and that he is willing and interested in helping her support the children and in being a stable support system for her. She stated that she has not yet received her medical-marijuana card because she lost the paperwork and was busy working. She said that she has filled out new paperwork, and it is ready to go in the mail. She stated that her visits with the children are going well; however, she said that she noticed a couple of weeks ago that MM was having a hard time once MM realized that appellant and Mobley were no longer together. She said that she has a bond with the children and that it would be detrimental to them if her parental rights were terminated. She stated that her rights should not be

terminated because she had made progress since the last hearing: she has a job, a place to live, and a vehicle.

On cross-examination by the ad litem, appellant testified that she did not have the children in therapy prior to their removal from her custody because she and Mobley had a very abusive (physical, mental, and emotional) relationship. She stated that she was not allowed to work and that there was no vehicle. She said that it was difficult for her to get the phone and set up appointments due to the nature of the relationship. She testified that rent is $500 and that Johnson works part-time at Cargill and works with Labor Finders where he makes about $100 a day. Appellant admitted that the children could not come home with her that day because of the size of the home. She acknowledged that she does not make enough money to support her children. She testified that she needs a medical-marijuana card for the PTSD and anxiety she has because of the abuse she suffered while with Mobley. She stated that she smokes marijuana for free with friends and family. Appellant agreed that the children "were doing good" in foster care and that their needs were being met.

Upon questioning by the circuit court, appellant stated that they have lived in the tiny house for about two months. She stated that she believed the $500 covered rent and utilities. She said that they lived with Johnson's step-grandfather in his one-bedroom apartment for three to four months before moving out. She stated that prior to that, they lived in a hotel for about two months.

Janet Mobley testified that she is the children's paternal grandmother. She said that the children were receiving all their medications and were attending all their doctor and

8

therapy appointments under her care. She said that she was interested in adopting the children if the circuit court granted DHS's TPR petition.

On cross-examination by the ad litem, Janet stated that there is nothing the children need that she is not able to provide, thanks to the assistance she receives via day-care vouchers and medical insurance. She stated that she receives board payments as the children's foster parent. She testified that she wants to adopt the children but that she also wants the family to still be able to communicate and have a relationship. She said that she would respect the circuit court's decision "where that's concerned." She stated that she could make the best decision for the children regarding any future contact with appellant and Mobley.

On cross-examination by Mobley's attorney, Janet stated that she believes it is in the children's best interest to have contact with appellant and Mobley. She said that she would continue a relationship between the children and appellant and Mobley if appellant and Mobley stayed healthy, sober, and on the right path.

Brandie Mobley testified that she is married to Janet. She said that she is willing to do whatever it takes for the children. She stated that she has the time and energy to give to the children. She testified that she has already rearranged her schedule so that she is working from home and is available for the children. She stated that she agrees 100 percent with Janet's testimony. She opined that the children are doing very well, are excelling in school, and are making "exceptional leaps and bounds with their therapies."

At the conclusion of the hearing, DHS asked the circuit court to grant its TPR petition based on all grounds alleged in the petition. Appellant's attorney asked the circuit

9

court to deny the petition and change the goal to permanent custody with a relative or subsidized guardianship. Alternatively, the attorney argued that if appellant's parental rights were terminated, the circuit court should allow Janet and Brandie to determine whether appellant and Mobley could visit with the children. The ad litem stated that she concurs 100 percent with DHS and argued that permanent custody is not in the children's best interest. She said that Janet and Brandie are willing and able and want to adopt and provide for the children, which she opined is in the children's best interest. She further stated that the children need permanency. The circuit court found that DHS had proved all the grounds alleged in its petition for TPR, that the children are adoptable, and that a permanent guardianship is not in the children's best interest because they need permanency. The circuit court granted DHS's petition. The circuit court found that unsupervised contact is harmful to the children but left it up to Janet and Brandie to determine whether visitation between the children and appellant and Mobley is in the children's best interest.

The TPR order was entered on January 15, 2021, outlining the court's oral ruling. As it pertains to the potential harm of returning the children to their parents, the order stated in pertinent part:

> The Court finds that parents have not remedied the conditions which caused removal over 15 months ago. Parents do not have appropriate and stable housing. . . . Parents have not shown they can meet the basic and special needs of the juveniles, by getting the kids to all of their therapies and making sure they are the best that they can be. Not once have the parents been in compliance with the case plan and court order. Parents have not demonstrated stability in their choices.

Appellant filed a timely notice of appeal and an amended notice of appeal on January 28.

10

We review termination-of-parental-rights cases de novo.[7] At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence.[8] In making a "best interest" determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent.[9] The potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence.[10] The potential-harm analysis is to be conducted in broad terms.[11] It is the "best interest" finding that must be supported by clear and convincing evidence.[12] We will not reverse a termination order unless the circuit court's findings are clearly erroneous.[13] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[14] Credibility determinations are left to the fact-finder.[15]

---

[7]*Roland v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 333, 552 S.W.3d 443.

[8]Ark. Code Ann. § 9-27-341(b)(3)(A), (B) (Supp. 2021).

[9]*Ware v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 480, 503 S.W.3d 874.

[10]*Pine v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 781, 379 S.W.3d 703.

[11]*Id.*

[12]*Singleton v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 455, 468 S.W.3d 809.

[13]*Fisher v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 39, 569 S.W.3d 886.

[14]*Id.*

[15]*Kerr v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 271, at 6, 493 S.W.3d 342, 346.

On appeal, appellant does not challenge the statutory grounds and instead limits her argument to the following: termination was not in the children's best interest where there was a lesser restrictive alternative such as permanent custody or guardianship that would preserve the family unit, and the evidence was insufficient to demonstrate that appellant posed a potential harm to her children. Because appellant has not challenged the circuit court's decision as to the statutory grounds for termination or adoptability, we need not address them on appeal.[16]

Appellant directs this court's attention to Arkansas Code Annotated section 9-27-329(d) to support her contention that the circuit court was to give preference to the least restrictive disposition available when considering the dispositional alternatives available to it.[17] Before DHS's TPR petition was granted, appellant asked the circuit court to deny the petition and to instead set the goal as permanent custody with a relative or subsidized guardianship. The circuit court denied appellant's request, contending that the children needed permanency. Appellant contends that the circuit court erred because it should have looked for ways to achieve permanency for the children through a less extreme remedy than termination, such as in *Ivers v. Arkansas Department of Human Services*,[18] and *Rhine v. Arkansas*

---

[16]*Fisher, supra.*

[17]To the extent that appellant's argument concerns the court's disposition at the PPH, we cannot address that portion of appellant's argument as she has failed to bring up a record of the PPH where the goal was changed to adoption and TPR. *See Velaquez v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 168.

[18]98 Ark. App. 57, 250 S.W.3d 279 (2007).

*Department of Human Services.*[19]   This is not a case, however, like *Ivers*, where the noncustodial parent demonstrated "commendable resolve in seeking to remedy his drug problem"[20] to achieve reunification because here, appellant continuously tested positive for THC and failed to remedy the conditions that caused removal. Nor is it like *Rhine*, which dealt with the circuit court's abuse of discretion in denying a motion for continuance so that the mother could sign a consent to the termination of parental rights.

Appellant also cites the considerations listed in *Phillips v. Arkansas Department of Human Services.*[21]   According to *Phillips*, considerations in making a best-interest finding may include the preservation of the children's relationship with a grandparent; the severance of child support from a parent; whether a less drastic measure could be employed such as a no-contact order or supervised visitation; whether continued contact with the parent would be beneficial to the children if or when the children are living with a relative and not in an indeterminate state that is working against them; and whether the children are living in continued uncertainty.  Appellant's reliance on *Phillips* for her less-restrictive-alternative argument is misplaced.  Appellant's children were in DHS custody and temporarily placed with their grandmothers; thus, the rationale in *Phillips* favoring a less restrictive alternative to termination of parental rights when a child is in the custody of a relative does not apply.[22] And as in *Phillips*, there was no compelling reason for the court to choose permanent custody

[19]101 Ark. App. 370, 278 S.W.3d 118 (2008).

[20]*Ivers*, 98 Ark. App. at 67, 250 S.W.3d at 286.

[21]2019 Ark. App. 383, 585 S.W.3d 703.

[22]*Id.*

rather than adoption and TPR because there was no reasonable prospect that appellant would eventually reunify with her children as demonstrated by her failure to challenge the statutory grounds at the termination hearing or on appeal.[23]  Additionally, Janet and Brandie wanted to adopt the children and give them permanency.

This case instead is similar to *Ross v. Arkansas Department of Human Services*,[24] in which this court rejected similar arguments that TPR was not in the children's best interest because the children were in stable placements and permanency was not an issue—noting that the potential harm posed by the parent to the children was clear.  Based on appellant's failure to remedy the conditions that caused removal, her failure to correct subsequent issues that led the circuit court to find that appellant manifested an extreme indifference to having the children returned to her, and the court's determination that continued services will not result in reunification—evidence of which is not disputed on appeal—we hold that this is not a case in which the court should have leaned toward less restrictive alternatives than TPR.

Appellant maintains that the children's best interest could have been better served by granting her the additional time she sought or by placing the children in the guardianship of their grandmothers.  The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's

---

[23]*Id.*

[24]2010 Ark. App. 660, 378 S.W.3d 253.

14

perspective.[25]  At the time of the termination hearing, the children had been in the temporary custody of their paternal grandmothers for fifteen months, and appellant was still not in a position to have them returned to her.  The children needed permanency, and the court found that the only way they could obtain the permanency they needed was by terminating appellant's parental rights.  We cannot say that the court erred by denying appellant's request for more time or by terminating her parental rights instead of placing the children in a guardianship.  The grandmothers wanted to adopt the children, and evidence showed that the children had thrived while in the grandmothers' custody.  Appellant showed an extreme indifference to having her children returned to her, and there were no services that would result in reunification.  There was no clear error in the circuit court's decision that adoption and TPR were the appropriate permanency goals for these children, and there are no grounds for us to hold that the court made a mistake in terminating appellant's parental rights.[26]

Finally, appellant maintains that TPR was not in the children's best interest because she did not pose any potential harm to them.  In considering potential harm caused by returning the child to the parent, the circuit court is not required to find that actual harm would result or affirmatively identify a potential harm.[27]  Potential harm must be viewed in

---

[25]Ark. Code Ann. § 9-27-341(a)(3).

[26]Appellant also argues that the circuit court's decision to allow the grandmothers to determine whether appellant should be allowed supervised visits with the children proves that termination was not in the children's best interest.  Appellant has failed to cite, nor have we found, any case law which holds that a potential adoptive parent cannot determine who can and cannot visit with the child.

[27]*Welch v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290.

a forward-looking manner and in broad terms, including the harm the child suffers from the lack of a stable, permanent home.[28] Here, the circuit court found that appellant's failure to maintain stability, her failure to remedy the conditions that caused removal, her failure to have appropriate and stable housing, and her failure to show that she can meet the basic and special needs of the children all pose potential harm to the children. Appellant cites what she considers progress on her part (her participation in counseling, her home, her employment, and her transportation) and is essentially asking us to reweigh the evidence. We do not act as a super fact-finder or second-guess the circuit court's credibility determinations.[29] Accordingly, we affirm the circuit court's termination of appellant's parental rights.

Affirmed.

GLADWIN and MURPHY, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Andrew Firth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.

---

[28]*Collins v. Ark. Dep't of Hum. Servs.*, 2013 Ark. App. 90.

[29]*Lynch v. Ark. Dep't of Hum. Servs.*, 2012 Ark. App. 149.